## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

ELAINE M. WILLIAMS,                                    CIVIL NO. 04-3977 PAM/AJB

PLAINTIFF,

                                                       REPORT AND RECOMMENDATION ON PARTIES'
V.                                                     CROSS-MOTIONS FOR SUMMARY JUDGMENT

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY,

DEFENDANT.

_____

Peter Vogel, Esq., from Rosenmeier, Anderson & Vogel, on behalf of plaintiff, Elaine M. Williams.

Lonnie F. Bryan, Esq., Assistant United States Attorney, on behalf of defendant, Jo Anne B. Barnhart, Commissioner of Social Security.

_____

## I.      Introduction

        Plaintiff Elaine M. Williams (Williams) appeals the unfavorable decision of the Commissioner of

Social Security Agency (Commissioner) denying her application for disability insurance benefits (DIB)

and supplemental security income (SSI).  This matter is before the court, United States Magistrate

Judge Arthur J. Boylan, for a report and recommendation to the district court on the parties cross-

motions for summary judgment.  *See* 28 U.S.C. § 636 (b)(1) and Local Rule 72.1.  Based on the

reasoning set forth below, this court **recommends** that Williams' Motion for Summary Judgment

[Docket No. 8] be **denied** and that the Commissioner's Motion for Summary Judgment [Docket No.

11] be **granted**.

1

## II.    PROCEDURAL HISTORY

Williams protectively filed her claim for disability on December 10, 2001.[1]  Williams filed for

disability insurance benefits (DIB) under Title II of the Social Security Act (SSA) and for Supplemental

Security Income (SSI) under Title XVI.  The claims were denied initially and upon reconsideration.

Williams requested and was granted a hearing before an administrative law judge (ALJ).   A hearing

was held on January 12, 2003 in St. Cloud, Minnesota before ALJ Diane Townsend-Anderson.

Williams appeared at the hearing represented by counsel, Peter Vogel, Esq.  Williams' sister, Carrie

Baker, testified on her behalf.  Karen Butler, Ph.D., testified as a neutral medical expert and Wayne

Onken testified as an neutral vocational expert (VE).  On April 30, 2004, ALJ Townsend-Anderson

issues her factual findings and decision denying both the claim for DIB and the claim for SSI.  (Tr. 30.)

## III.    FACTUAL BACKGROUND

Williams was born on June 2, 1950 and was 53 years old at the time of the hearing.  She has

completed high school and has worked at a variety of positions including cashier, housekeeper, mail

clerk, and waitress.  (Tr. 22.)  Williams' husband died of cancer in March 1996.  (Tr. 76.)  Williams

filed for disability alleging an onset date of April 9, 2000.  (Tr. 76.)  She claims disability due to

depression, back problems, and arthritis in the hands.  (Tr. 144.)  Williams was hospitalized in March

of 1998 and June of 2000 for attempted suicide.  (Tr. 95, 196.)  At the time of her application,

---

[1]    Williams has previously filed an application for DIB on June 26, 1998, with a protective
file date of June 4, 1998, and an alleged onset date of January 31, 1996.  The application was initially
denied and denied at the reconsideration stage based on insufficient evidence furnished to the Social
Security Agency (Agency).  (Tr. 86.)

Williams was taking Zoloft, Trazodone, and Welbutrin.[2] (Tr. 149.) She last worked in April 2000. (Tr. 145.) She was fired from that position due to attendance issues. (Tr. 144.)

Williams states that she works on cross-stitch several times a day. (Tr. 181.) She cooks, reads, and watches television daily. (*Id*.) She cleans house, grooms self and bathes weekly. (*Id*.) She shops and pays bills monthly. (*Id*.) She states that she watches her granddaughter whenever her son needs a sitter. (*Id*.) She never drives, does yard work, participates in clubs or attends meetings, plays cards or games, talks to neighbors, goes out to eat or engages in exercise activities. (*Id*.)

Williams has been in treatment for alcoholism. (TR. 97.) In May 2000, after a period of sobriety, Williams began drinking again. She got her son's gun and claims that she wanted to shoot herself, but that she didn't have any bullets. She called a friend and went to a treatment center. (Tr. 183.) She claims that when she gets drunk, she talks and thinks about suicide. (Tr. 180.)

## IV.   MEDICAL EVIDENCE

Williams was diagnosed with alcohol dependance at least as early as March 22, 1998 when she was placed in treatment after threatening suicide. (Tr. 201.) She underwent a month long treatment for alcohol dependancy and then stayed in a halfway house. (Tr. 209.) In June 1998, Williams was diagnosed with Major Depressive Disorder. (Tr. 215.) In September 1999, Williams' treating psychologist, Michael Stapleton, M.A., conducted several psychological tests. (Tr. 231.) Dr. Stapleton explained that the results indicated that Williams was suffering from psychosis at a much more

---

[2]      Zoloft, Trazodone and Welbutrin are all used to treat depression. *See MedlinePlus Drug Information* at http://www.nlm.nih.gov/medlineplus/druginformation.html.

significant level than her appearance would suggest.  (*Id*.)  He stated that she scored in the 87th

percentile in overall intelligence which places her in the above average to superior range.  According to

Dr. Stapleton, the comparison of her verbal/information perspective score with her abstract/problem

solving score was statistically significant in indicating a learning disability.  (*Id*.)  He explained that based

on the results of these tests, he felt that she was suffering from a "Major Depression Disorder with

possible features of psychosis, superimposed on Obsessive/Compulsive Disorder, and alcoholism in full

remission."  (Tr. 232.)  He also stated that she met the criteria for a Schizotypal Personality Disorder

with "some indication that she may have a persuasive developmental disorder such as Aspergers

Syndrome."[3]  (*Id*.)  Stapleton concluded that Wilson had been dysfunctional since her husband's death

and that she was unlikely to significantly improve in the next one to two years.  (*Id*.)  He noted that her

condition warranted Social Security Disability.  (*Id*.)

In May 2000, Williams was admitted to the Grace Unit at St. Joseph's Medical Center in

Brainerd, Minnesota.  (Tr. 246.)  She had been transferred there from the emergency room she had

been taken to after threatening to commit suicide.  (*Id*.)  According to the medical records signed by

Leonard T. Fielding, M.D., Williams had decided to drink after two years of sobriety.  After she had

three beers and three shots of liquor, she tried to kill herself with her son's gun.  (*Id*.)  The doctor

explains that Williams told him that she put the gun to her head but could not figure out how to

---

[3]        Aspergers Syndrome is pervasive developmental disorder similar to autism.
*MedlinePlus Medical Encyclopedia* at http://www.nlm.nih.gov/medlineplus/encyclopedia.html.
Persons with this syndrom have impaired social interactions and develop limited repetitive patterns of
behavior.  *Id.*  "While people with Asperger syndrome are frequently socially inept, many have
above-average intelligence, and they may excel in fields like computer programming and science."  *Id.*

disengage the safety.  (*Id*.)  She then went to the neighbors who took her to the emergency room.  (*Id*.)

Williams told Dr. Fielding that she could not remember the events of the previous evening except that

she did recall "seeing the gun lying there and going to the neighbors."  (Tr. 247-48.)  He characterized

Williams as alert, pleasant and cooperative with the appropriate affect, and at least average intelligence,

with no delusional thoughts or suicidal ideation.  (*Id*.)  He diagnosed her as having a Major Depressive

Disorder, recurrent episode; alcohol intoxication, cleared; reported history of arthritis treated with over

the counter medication; and a GAF of 55.[4]  (*Id*.)

On May 25, 2000, Williams went to the Behavioral Health Clinic at the St. Cloud Hospital in

St. Cloud, Minnesota for a psychiatric evaluation.  (Tr. 260.)  At the clinic she was seen by Ann

Kooiker, M.D.  Dr. Kooiker described Williams as neatly dressed and cooperative with good eye

contact and rapport, depressed mood and affect, but "oriented with no thought disorder or cognitive

impairment."  (Tr. 259.)  Additionally, Dr. Kooiker noted that Williams' insight and judgment were

intact.  (*Id*.)  She diagnosed Williams as having a major depressive disorder, recurrent, severe; history

of alcohol dependence with recent relapse, experiencing moderate psychological stress and a current

GAF of 50.[5]  (*Id*.)  Dr. Kooiker prescribed Zoloft and increased Williams' dosage of Trazodone.  (*Id*.)

Dr. Kooiker recommended that Williams attend AA meetings, but Williams stated that she did not like

---

[4]     The Global Assessment of Functioning (GAF) Scale is used to rate an individual's overall psychological, social, and occupational functioning. Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR ) 32 (4th ed.2000). A GAF score in the range of 51-60 indicates "moderate symptoms (e.g. flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g. few friends, conflicts with peers or coworkers)."  *Id.*

[5]     A GAF score of in the range of 41-50 indicates "serious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job)."  *Id.*

groups.  (*Id*.)

For the following six months, Williams visited Dr. Kooiker approximately monthly.  (Tr. 249-60.)  At each visit, Dr. Kooiker questioned Williams about her symptoms of depression and sleep difficulties.  (*Id*.)  Based on Williams' responses, Dr. Kooiker adjusted Williams medication accordingly.  (*Id*.)  In two of these visits, Dr. Kooiker recommended that Williams see a psychoanalysts.  (Tr. 257, 254.)  Williams initially resisted the suggestion stating that she wanted to see if the medications would work.  (Tr. 254.)   Williams then stated that she would consider psychotherapy treatment after first trying to alleviate her problems through medication.  (Tr. 257.)

Williams visited Dr. Kooiker on June 20, 2002.  (Tr. 249.)  Dr. Kooiker noted that Williams had last been in for treatment in November 2001.  (*Id*.)  Dr. Kooiker also noted that Williams was feeling chronically, mildly depressed, but eating and sleeping well, and frequently spending time with her granddaughter.  (*Id*.)  Dr. Kooiker refused to sign a form indicating that Williams could not work.  (*Id*.)  Dr. Kooiker stated: "I told her that at this point, I think it would be much better for her if she started trying to work, at least on a part-time basis, and that I believe if she had to do this, she could."  (*Id*.)  Dr. Kooiker recommended that Williams resume psychotherapy and that she should contact a clinic to help her into the work force.  (*Id*.)  The doctor noted that Williams agreed to do this.  (*Id*.)

According to the submitted records, Williams last saw Dr. Kooiker on July 25, 2003.  (Tr. 332.)  In the treatment notes from this visit, Dr. Kooiker observed that she told Williams that it was important that Williams come in more frequently.  (*Id*.)  In addition, she noted that Williams was doing well and reported a definite improvement with the increase dosage of Welbutrin.  (*Id*.)  Dr. Kooiker also noted that Williams was not seeing a psychotherapist as she had recommended.  (*Id*.)

On August 5, 2002, Williams was seen by a state consulting examiner, James F. Lewis, Ed.D. (Tr. 261.)  Dr. Lewis described Williams' typical day as waking at 8:00 a.m., baby-siting children from 10:00 a.m. until 3:00 p.m., eating dinner, approximately four hours of watching television and cross-stitching, and going to bed by 10:00 p.m.  (Tr. 263.)  Dr. Lewis noted that Williams was living with another women and her two children.  (*Id*.)  In this arrangement, Williams did all of the cooking and cleaning in exchange for half the rent and grocery bill.  (*Id*.)  Dr. Lewis stated that Williams avoids leaving home, but has friends who come to her house to play cards and talk and that she sees her son daily.  (*Id*.)  Although she used to drink up to 1 ½ cases of beer every day, Williams told Dr. Lewis that she had been sober since May 2000.  (*Id*.)

Dr. Lewis observed that Williams was in contact with reality; she was oriented by name, place, and time; she could recall five numbers forward and three numbers backward; she could rapidly recite the ABC's; she rapidly counted backwards from twenty by ones and forward from one by threes; she was unable to court backwards from 100 by serial sevens.  (Tr. 264.)  Williams recalled three out of three objects after five and thirty minutes and she could concretely interpret four out of four proverbs. (Tr. 264-65.)

Dr. Lewis described Williams as having adequate eye contact and conversation skills, with logical, coherent and logical verbal responses.  (Tr. 264.)  He noted that she had some problems recalling dates and sequences of major events in her life.  (*Id*.)  He noted that her appetite was adequate and her weight was stable but that she has problems sleeping when she does not take Trazodone.  (*Id*.)  He described her mood and affect as flat, stating that she never smiled or laughed. (*Id*.)  He noted that she describes herself as irritable and having periods of crying everyday with no idea

7

what triggers her crying.  (*Id*.)  He also noted that there is some social withdrawal.  (*Id*.)

Based on this evaluation and observations, Dr. Lewis diagnosed Williams with major depressive disorder, recurrent; panic disorder with agoraphobia; obsessive-compulsive disorder; alcohol dependency in remission since 2000, and a GAF or 50.[6]  (Tr. 265.)  Dr. Lewis concluded that Williams is unable to work at an adequate pace due to pain, low energy, and anxiety.  (*Id*.)  He noted that if she were to obtain a job, she would miss too much work due to agoraphobia, pain, and depression.  (*Id*.)

Dr. Lewis was consulted again on April 8, 2003.  (Tr. 294.)  He reported tests results from tests taken in January 2003.  These tests indicate an IQ in the low 90s, reading level in the 25th percentile, spelling level in the 27th percentile and arithmetic level in the 14th percentile.  (Tr. 295.)  Dr. Lewis describes her interests as reading books by Tom Clancy and John Grisham, working on cross-stitch, watching television, and spending time with her granddaughter.  (*Id*.)  Dr. Lewis noted that two to three days a week, Williams' 2-year-old granddaughter and 7-year-old nephew stay with her for a few hours.  He observed that her conversation skills and eye contact were adequate; her verbal responses were logical, coherent, relevant and on topic; and she was able to recall three of three objects after five and thirty minutes.  (Tr. 296-97.)

Dr. Lewis concluded that the tests results did not indicate a learning disability, nor did Williams' history indicate a diagnosis of Attention Deficit Hyperactivity Disorder (ADHD).  (Tr. 298.)  He noted that Williams does her own cooking, housecleaning and shopping, but does not drive because of failure

---

[6]        *See supra* note 5.

to pay parking tickets. (*Id.*)  He also notes that she has not been applying for jobs.  (*Id.*)  Dr. Lewis

reiterated his previous diagnoses and conclusion that Williams would be unable to work.  (Tr. 289-99.)

On August 17, 2002, Williams was evaluated by A. Neil Johnson, M.D.  (Tr. 267.)  Dr.

Johnson, conducted a physical examination of Williams.  (*Id.*)  He notes normal ranges for spinal

evaluation.  (Tr. 268.)  He also notes some back pain, with some tenderness over the mid to lower

back, but no spasms.  (*Id.*)  Dr. Johnson concluded that there was a loss of motion accompanied by

pain with respect to Williams' back.  Her motor strength was 5/5 and she walked with normal a gait.

(Tr. 269.)  On the same date as the physical examination, Williams underwent an examination of her

spine by a radiologist.  (Tr. 271.)  The radiologist found no abnormalities.  (*Id.*)

On January 9, 2003, Williams was seen by Tim Tinius, PhD., for a psychological examination

on referral by her attorney.  (Tr. 286.)  Dr. Tinius conducted several psychological tests in a variety of

areas, including: intellectual, academic, higher cognitive, attention, memory, neuropsychological

impairment scale, and vocational.  The treatment notes explain in detail the results of the testing in each

of these different areas and how a person with similar test results would likely to respond under certain

conditions.  (Tr. 287-91.)

According to Dr. Tinius, Williams "has an overall intellectual functioning in the low end of the

average range" and the results of the tests "indicate a significant level of attention problems."  (Tr. 291-

92.)  He stated that she has most likely had these attention problems for years but that she has managed

to compensate for these deficiencies.  (Tr. 292.)  He suggested that these difficulties may be the result

of an automobile accident or due to cognitive problems related to her suicide attempts, but that they

were most likely from an undiagnosed ADHD.  (*Id.*)  Dr. Tinius also suggested that Williams'

symptoms are consistent with a Borderline Personality Disorder.  (Tr. 292.)  He stated that she would

likely have significant problem with organization of thought, communication with others, sustained

attention, and completing tasks as assigned.  (*Id.*)  He concluded that Williams would be unlikely to

meet basic employment requirements.  (*Id.*)

A mental functional capacity assessment was completed on May 16, 2003.  (Tr. 300.)  The

consulting medical examiner, Gregory Koreski, Ph.D., L.P., concluded that Williams was moderately

limited in the ability to (1) understand and remember detailed instructions; (2) perform activities within a

schedule, maintain regular attendance, and be punctual within customary tolerances; (3) interact

appropriately with the general public; (4) respond appropriately to the criticism of her supervisors; and

(5) set realistic goals of make plans independently of others.  (Tr. 300-01.)  He concluded that in all

other aspects, Williams was not significantly limited.  (*Id.*)  He summarized that Williams would be able

to concentrate, understand and recall one to two step instructions; carry out routine tasks with adequate

persistence and pace for at least entry level work; tolerate routine, superficial contact with coworkers

and the general public; and adapt to the routine changes in the workplace.  (Tr. 302.)  In the

accompanying Psychiatric Review Technique Form (PRFT), Dr. Korgeski opined that Williams had

mild limitations in restrictions of daily living; mild difficulties in maintaining a social functioning, and

moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of

decompensation of extended duration.  (Tr. 318.)

## V.   TESTIMONY AT ADMINISTRATIVE HEARING

A hearing was held on January 12, 2003 in St. Cloud, Minnesota before ALJ Diane

Townsend-Anderson. Williams appeared and testified at the hearing, as well as Williams' sister, Carrie

Baker. Karen Butler, Ph.D., testified as a neutral medical expert and Wayne Onken testified as an

neutral vocational expert (VE).[7] Williams told the ALJ that she lived in her son's home with her son,

her son's girlfriend and their three-year-old daughter, her granddaughter. (Tr. 359.) Williams told the

ALJ that she could not work because she gets panicky when she leaves the house. She described

getting ready for work and even driving part way there, but eventually turning around and coming home.

(*Id.*) Williams stated that she cleans the house, watches movies on the televison and does crafts such

as cross-stitch. She reads and plays with her granddaughter. She does all of the cooking for the

household. She explained that she does not have any trouble cooking and that she when she cooks she

likes to cook for a lot, not just herself. (Tr. 374.)

She stated that she does not have any friends and does not belong to any club or organization.

(Tr. 361.) She explained that she watches her granddaughter whenever the girl's parents are gone.

Williams said that she does not like being around other people. (Tr. 362.) She was not seeing a

therapist. (Tr. 364.) She claims that she was fired from her last job as a telemarketer with Fingerhut

because of attendance problems. (Tr. 365.) She explained that everything was going well, she was

feeling much better and then she quit taking her medication, began drinking and "everything just kind of

went downhill." (*Id.*) She began missing work at that point. (*Id.*)

---

[7]     The pages of the transcript of the VE's testimony are missing from the record. (*See* Tr.
383-87.) The government is in the process of finding these missing pages. Because Williams does not
challenge the VE's testimony or opinion and the missing pages do not effect the outcome or analysis of
this report and recommendation, this report and recommendation will be submitted although pages in
the record have yet to be located.

Williams said that she normally stays in her bedroom where she watches television and works on her cross-stitch.  (Tr. 367.)  She stated that is takes her a very long time to finish a project and that she sometimes she loses count of her stitches and has to remove her stitching and redo her work.  (*Id.*)  She explained that she does not like going grocery shopping and that she almost always has someone do her shopping for her but that she had recently gone with her sister to the store because her sister made her go. (Tr. 368.) She said that she leaves the house once every two weeks to once a month.  (Tr. 369.)  She said she goes out in the early spring, fall, and winter but not in the summer because it is too hot.  (*Id.*)  She explained that she did not know why she did not like leaving the house, but that she felt more comfortable a home.  (Tr. 369-70.)  She explained that she would go to counseling , but that "someone's got to get me there."  (Tr. 374.)

Williams' sister, Carrie Barker, testified on behalf of Williams.  (Tr. 375.)  She explained that Williams had been staying with her for the past two weeks.  (*Id.*)  Barker stated that Williams got along well with her husband and eight-year-old son. (*Id.*)  Barker said that she and Williams had painted Barker's kitchen and that Williams spent time doing cross-stitching, watching television, and playing Playstation.  (*Id.*)  She testified that Williams does not like to go anywhere but that "[i]f you go and tell her, 'you're going with me,' she'll say, 'oh, okay.'"  (Tr. 376.)  Barker explained that she had insisted that Williams go with her to the grocery store even though Williams had not wanted to go.  She said that Williams did fine "[o]nce I got her there."  (Tr. 379.)  She stated that Williams began isolating herself from others about three years earlier.  (*Id.*)  Prior to that time, she explained, Williams had been very active.  (Tr. 379.)  She also explained that it was approximately three years ago that Williams had last drunk alcohol.  (Tr. 377.)

Dr. Karen Butler testified as a neutral medical expert.  (Tr. 380-supplemental to record.)  She explained that Williams had been diagnosed with major depressive disorder, ranging from severe to fully remitted and "anxiety NOS, panic with agoraphobia and obsessive-compulsive disorder."  (*Id.*)  She noted that Williams' treating psychiatrist does not note or treat an anxiety or panic disorder, but that the anxiety disorder was diagnosed by "one-spot consultive examinations."  (Tr. 301-81.)  Dr. Butler noted self reports of sleep disturbance, varying level of energy, decreased concentration, periods of suicidal ideation, increased heart beat, sweating, fluttering sensation in her stomach, an urge to leave places, having to count things in sets of six on a daily basis, excessive cleaning, counting patterns, and skin-picking.  (Tr. 381.)

Dr. Butler noted that Williams reported cooking, cleaning, doing her own laundry, able to attend her own finances, and independently grooming and bathing.  (*Id.*)  Based on this information, she concluded that Williams was mildly impaired in her activities of daily living.  (*Id.*)  She also concluded that Williams had moderate difficulties in maintaining social functions, noting that Williams had reported a few friends with infrequent face to face contact.  (Tr. 382.)  She determined that Williams' concentration, pace , and persistence are also moderately impaired.  (*Id.*)  She emphasized that testing indicated Williams' IQ in the average range, with concentration and attention in the somewhat below average range.  (*Id.*)  She remarked that there was no indication of any episodes of decompensation for an extended duration, although she did note Williams being hospitalized for overnight in May 2000.  (*Id.*)

Dr. Butler explained that the record indicated that Williams' depression had been severe in April 2000, but the record also indicated that the depression was successfully being treated with

13

medication, symptoms were under control, in partial remission in January 2001 and June 2002, and in full remission in July 2003.  (Tr. 383.)  She concluded that Williams would be able to "work at a simple and unskilled nature, where tasks can be well learned . . . with minimal standards for production and pace as a means to reduce the stress of work . . . with brief and superficial contact with others.  (*Id.*)

The ALJ then posed a hypothetical question, based on the opinions of Drs. Kooiker and Butler, to the vocational expert (VE) Wayne Onken.  The hyopthetical was based on a person who is

> 49-years old with a 12th grade education or with experiences outlined by herself, [who is] on a number of medications with no apparent side effects, who's impaired with back pain, arthritis in the hands, who suffers from depression and anxiety NOS, who has an alcohol dependency history, who is limited to lifting and carrying 50 pounds, occasionally, 25 pounds, frequently, who can do work where three would be no exposure to temperature, humidity extremes, only occasionally bending, stooping, crouching, crawling and twisting, doing work where there would be brief and superficial contact with others, doing work that is simple and unskilled in nature in low-stress environment where minimal industrial standards for production and pace are applicable, and an alcohol-free environment.

(Tr. 385.)  The VE testified that a person with this criteria would de able to do the claimant's past relevant work of housekeeping, cleaning, mail clerk, or cashier.  (*Id.*)

## VI.   THE ALJ'S FINDINGS AND DETERMINATION

The Agency has adopted regulations establishing a five-step procedure for determining whether a claimant is disabled within the meaning of the Social Security Act.  *See* 20 C.F.R. §§ 404.1520(a)(4); 416.920(a)(4).[8]  The Eighth Circuit has summarized these steps as follows:

---

[8]      Regulations under section 404 pertain to claims for DIB and section 416 pertain to claims for SSI.  Although in different sections of the SSA, the determination of disability under either section follows the same procedure and standards.  *Barnhart v. Thomas*, 540 U.S. 20, 23 (2003).

The Commissioner must determine: (1) whether the claimant is presently engaged in "substantial gainful activity;" (2) whether the claimant has a severe impairment--one that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations (if so, the claimant is disabled without regard to age, education, and work experience); (4) whether the claimant has the residual functional capacity [RFC] to perform his or her past relevant work; and (5) if the claimant cannot perform the past work, the burden shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.

*Fines*, 149 F.3d at 895.  If the claimant has a medically determined mental impairment, the ALJ must proceed through additional steps as outlined in §§ 404.1520a and 416.920a.  According to §§ 404.1520a(c) and 416.920a(c), the ALJ must rate the claimant's degree of limitation in four broad functional areas.  These four areas are: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation.  20 C.F.R. §§ 404.1520a(c)(3) and 416.920a(c)(3).  The ALJ must rate the degree of limitations on a five-point scale: None, mild, moderate, marked, and extreme.  20 C.F.R. §§ 404.1520a(c)(4) and 416.920a(c)(4).  If by using these ratings the ALJ determines that the impairment is severe, but does not meet a listed impairment, the ALJ must assess the claimant's RFC as described in step four of the determination procedure.  20 C.F.R. §§ 404.1520a(d)(3) and 416.920a(d)(3).

Here, the ALJ determined that Williams met the diagnosis and "A" criteria for listed impairments 12.04, affective disorders; 12.06, anxiety related disorders; and 12.09, substance addiction disorders.[9]  (Tr. 25.)  The ALJ, based on Dr. Butler's summary of the medical evidence,

---

[9]    See Pt. 404, Subpt. P, App. 1 for listed criteria for each category.  The claimant's symptoms must meet the criteria listed in paragraphs A and B (or paragraphs A and C for certain impairments) for the claimant to be disabled under the Social Security Act.  Pt. 404, Subpt. P, App. 1

determined that Williams was only mildly limited in her activities of daily living, moderately limited in her

social functioning, moderately limited in her ability to maintain concentration, persistence and pace, and

has had no episodes of decompensation of an extended duration.  (Tr. 26-26.)  Thus, the ALJ

concluded that the severity of the impairments, as determined by the paragraph "B" criteria, was

insufficient for a finding of disability based on a listed impairment.  (*Id.*)  In addition, the ALJ noted that,

based on the record and Dr. Butler's statements, Williams failed to meet any paragraph "C" criteria.

Based on these findings, the ALJ concluded that Williams' impairments, while severe, did not meet or

equal a listed impairment.  (*Id.*)

Next, the ALJ made an assessment of Williams' subjective complaints and evaluated the

medical records in order to determine whether Williams had the residual functional capacity to perform

her past relevant work.  (Tr. 26.)  The ALJ granted substantial weight to the medical opinion of

Williams' treating physician and the opinion of the impartial medical expert that testified at the hearing.

(Tr. 27.)  The ALJ placed less weight on th opinions of the consulting examiners, Drs. Lewis and

Tinius.  (*Id.*)  The ALJ determined that Williams testimony concerning her subjective symptoms was

reasonably credible.  (*Id.*)  The ALJ determined that Williams' description of her daily activities,

including doing needlework, spending time with her granddaughter, cooking for the household, and

reading books, did not demonstrate that her mental impairments imposed a significant restriction in daily

activities.[10]  (*Id.*)  The ALJ noted that Williams lost her most recent job because she stopped taking her

at 12.00 A.

[10]      The ALJ notes, and there is some evidence in the record to indicate some limitations imposed by physical impairments.  Williams does not challenge the ALJ's determination with respect to physical impairments, but notes that Williams' main complaint is of her mental impairments.  (Pl. Mem.

medicine and stopped going to work.  Taking into account Dr. Kooiker's opinion that Williams was

should return to work activity and that Dr. Butler opinion that Williams could perform simple, unskilled

work at a minimal pace, of low stress and minimal contact with others, and granting less weight to the

consulting examiners opinions that Williams would be unable to function in the workplace, and

considering Williams' partially credible subjective complaints, the ALJ determined that Williams had the

following RFC:

> [Williams] is able to lift and carry up to 50 pounds maximum and 25 pounds frequently.
> She is limited to work with no temperature of humidity extremes, and occasional
> bending, stooping, crouching, crawling and twisting.  Claimant is limited to brief and
> superficial contact with others, is limited to work that is simple and unskilled in nature, in
> a low stress environment with minimal industrial standards for prosecution and pace.
> Claimant is limited to working in an alcohol-free environment.

(Tr. 28.)

After determining Williams' RFC, and considering the testimony of the vocational expert, the

ALJ found that Williams had not met the burden of demonstrating that she could not perform her past

relevant work of mail clerk, house cleaner or cashier.  (*Id*.)  Accordingly, the ALJ concluded that

Williams failed to meet the definition of disabled within the meaning of the Social Security Act.  (*Id*.)

## VII.   DISCUSSION

### A.   *Standard of Review*

This court will affirm the ALJ's findings that the claimant was not under a disability if the findings

are supported by substantial evidence based on the entire record.  *Haley v . Massanari*, 258 F.3d

at 2.)

742, 747 (8th Cir. 2001). "Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support the decision." *Id.* (quoting *Beckley v. Apfel*, 152 F.3d 1056, 1059 (8th Cir. 1998)). The review the court undertakes, however, must go beyond solely the examination of the record for evidence in support of the Commissioner's decision. *Id.* The court must additionally examine the record for evidence that detracts from that decision. *Id.* Nevertheless, as long as there is substantial evidence to support the decision, this court will not reverse it simply because substantial evidence exists in the record that would support a contrary outcome or because this court might have decided differently. *See id.*

> B.      *Analysis of the ALJ's Decision*

>> 1.      Weight Given to Medical Sources

Williams argues that the ALJ improperly granted significant weight to Dr. Butler's and Dr. Kooiker's opinions. The ALJ declined to grant significant weight to the opinions of two consulting experts, but instead granted significant weight to the treating physician's opinion and that of the testifying neutral medical expert. The neutral medical expert, Dr. Butler, reviewed Dr. Kooiker's treatment notes, as well as the notes of the consulting experts, and agreed with Dr. Kooiker's opinion. Generally, the opinion of a treating physician is given controlling weight if it is not inconsistent with the record as a whole. *Ellis v. Barnhart*, 392 F.3d 988, 995 (8th Cir. 2005). Here, Dr. Kooiker's opinion that Williams could perform work is not inconsistent with the record as a whole. Thus, it was proper for the ALJ to give more weight to the treating physician than to consulting experts who had seen Williams on only one or two visits. In addition, the ALJ could properly give substantial weight to the neutral medical expert when her opinion was consistent with that of the treating physician. The ALJ may also properly

18

grant little weight to a consulting physician's opinion, especially when it appears that the opinions are inconsistent with the treatment notes and other medical expert opinions. *Guilliams v. Barnhart,* 393 F.3d 798, 803 (8th Cir. 2005) ("Physician opinions that are internally inconsistent, however, are entitled to less deference than they would receive in the absence of inconsistencies.")

Williams argues that Dr. Kooiker's opinion should granted less weight because it was not based on the results of any medical testing, while Drs. Lewis and Tinius's opinions were based on medical tests. The use of medical tests in determining a diagnosis or reaching an opinion as to limitations, however, is only one criteria that the ALJ must consider. 20 C.F.R. §§ 404.1527(d); 416.927(d). The ALJ may also consider the length of time and frequency of the claimant's visits to that expert. 20 C.F.R. §§ 404.1527(d); 416.927(d). In addition, the ALJ may consider how the opinion relates to other medical evidence in the record. 20 C.F.R. §§ 404.1527(d); 416.927(d).

In this case, Dr. Kooiker had a long term relationship with Williams. Dr. Kooiker saw Williams for a total of twelve times over a three year period. The first six visits were approximately once a month. Each visit is described as a visit for medical management and supportive psychotherapy. Dr. Kooiker examined Williams for fifteen minutes each visit. She evaluated the effectiveness of the medication, evaluated Williams symptoms, and suggested and encouraged additional therapies. Her conclusions are supported by the substance of her treatment notes which indicate that the medicine is improving Williams depressive symptoms, that she needs to be consistent in taking her medication, that she would benefit from additional psychotherapy, and that side effects of the medication were addressed by adjusting the dosages.

Dr. Lewis, by contrast, evaluated Williams on a single day for an unspecified amount of time.

He concluded that Williams is precluded from all work because she would be unable to function in a

work environment due to pain, low energy, anxiety and agoraphobia.  He noted, however, that for five

hours a day, she babysat for the children of the family that was living with her.  He also noted that she

prepared dinner for the entire household every evening, did cross-stitch and cleaned the house.  At the

later evaluation, he again notes the amount of time Williams spent with her young granddaughter and

nephew, that she reads books by Tom Clancy and John Grisham, and has only some social withdrawal.

In spite of this, he summarily concludes that Williams would be unable to work.  In light of the

inconsistencies between Dr. Lewis' description of Williams' daily activities and his conclusion regarding

Williams' capabilities, it was proper for the ALJ to grant lesser weight to Dr. Lewis' opinion that

Williams is unable to work.  *Guilliams,* 393 F.3d at 803.

At the request of Williams' attorney, Dr. Tinius evaluated Williams and opined that Williams

would be unable to work based, not on his own observations of her actions or her description of her

daily activities, but on the statistical probabilities that an individual with testing results similar to that of

Williams' would be unable to perform in the workplace.  Dr. Tinius suggests that Williams has problems

consistent with ADHD and Borderline Personality Disorder.  Neither of these diagnoses have been

suggested by other medical professionals.  In fact, Dr. Lewis specifically rejects a diagnosis of ADHD.

(Tr. 298.)   In addition, the test results are inconsistent with Williams reports of daily activities.  In light

of the inconsistency between Dr. Tinius' opinion and other evidence in the record, the ALJ could

properly grant less weight to the consulting experts opinion.  *See Guilliams,* 393 F.3d at 803.

### 2.   Criteria to Meet or Equal a Listed Impairment

Williams also argues that the ALJ should have found that Williams met the criteria under

paragraph "B" or "C" for the listed impairment under 12.04, affective disorder.  Thus, Williams argues,

the ALJ should have found Williams disabled at step three of the analysis.

The plaintiff bears the burden in establishing that her impairment meets or equals a listed

impairment.  *Johnson v. Barnhart*, 390 F.3d 1067, 1070 (8th Cir. 2004).   To meet a mental

impairment listing under section 12.04 (affective disorders), the claimant's impairment must meet the

criteria listed in paragraph "A"[11] and must result in at least two of the following:  "Marked restriction of

activities of daily living; or [m]arked difficulties in maintaining social functioning; or [m]arked difficulties

in maintaining concentration, persistence, or pace; or  [r]epeated episodes of decompensation, each of

extended duration."[12] 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.04.  Even if she fails to satisfy the

criteria for either paragraph "A" or "B", a claimant will be found disabled if she meets the criteria listed

under paragraph "C."[13]

---

[11]      In this case, the ALJ determined that Williams met the criteria under paragraph "A" for
sections 12.04, 12.06, and 12.09 of the Listed Impairments.  (Tr. 25.)  This finding is not challenged by
either party.

[12]      This criteria is identical for sections 12.06 (anxiety related disorder) and 12.09
(substance addition disorders).  *See* 20 C.F.R. Pt. 404, Subpt. p, App. 1 § 12.06 & 12.09.

[13]      A claimant will be found disabled due to an affective disorder as described under
section 12.04, if the impairments under paragraph "A" have lead to a

[m]edically documented history of a chronic affective disorder of at least 2 years'
duration that has caused more than a minimal limitation of ability to do basic work
activities, with symptoms or signs currently attenuated by medication or psychosocial
support, and one of the following:

1. Repeated episodes of decompensation, each of extended duration; or

2. A residual disease process that has resulted in such marginal adjustment that even a
minimal increase in mental demands or change in the environment would be predicted

Here, the ALJ determined, based on the testimony of Dr. Butler, that Williams failed to meet the "B" or "C" criteria. Noting Williams' ability to live independently and taking into account the description of Williams' daily activities, the ALJ found that Williams activities of daily living were mildly limited. Again relying on Dr. Butler's opinion and noting Williams interaction with friends and sister, the ALJ found that Williams was moderately limited in social functioning.

Dr. Butler's opinion regarding the severity of Williams' impairments as they related to the criteria for a listed impairment is consistent with the record. There are no other opinions in the record which directly contradict Dr. Butler's assessment of the "B" and "C" criteria. Furthermore, Dr. Korgeski's conclusions regarding Williams' functional limitations and the degree of limitations in the PRTF are the same as Dr. Butler's conclusions. (Tr. 318.) Thus, the ALJ's determination that the severity of Williams' impairments did not equal or meet a listed impairment is supported by substantial evidence in the record.

## VIII.  CONCLUSION AND RECOMMENDATION

Based on the a review of the record, the court finds that the ALJ's determination Williams'

---

to cause the individual to decompensate; or

3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.04(C).

A claimant will be found disabled due to an anxiety related disorder under section 12.06, if the impairments listed in paragraph "A" result "in the complete inability to function independently outside the area of one's home." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.06(C).

22

impairments did not meet or equal a listed impairment and that she was able to perform her past

relevant work is supported by substantial evidence.  Thus, this court **recommends** that Williams'

Motion for Summary Judgment [Docket No.8] be **denied** and that the Commissioner's Motion for

Summary Judgment [Docket No.11] be **granted**.

Dated:  July 11, 2005

s/ Arthur J. Boylan
Arthur J. Boylan
United States Magistrate Judge

## NOTICE

Pursuant to Local Rule 72.1(c)(2), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties, written objections which specifically identify the portions of the Report to which objections are made and the bases for each objection.  This Report and Recommendation does not constitute an order or judgment from the District Court and it is therefore not directly appealable to the Circuit Court of Appeals.  Written objections must be filed with the Court before **July 26, 2005.**